RENDERED: AUGUST 16, 2018
TO BE PUBLISHED

# Supreme Court of Kentucky

2017-SC-000066-DG

FINAL

DATE 11/1/2018 Kim Redmon, DC

AMERICAN MINING INSURANCE COMPANY                    APPELLANT

V.
ON REVIEW FROM COURT OF APPEALS
CASE NO. 2015-CA-000055
OWSLEY CIRCUIT COURT NO. 10-CI-00005

PETERS FARMS, LLC                                    APPELLEE

## OPINION OF THE COURT BY JUSTICE CUNNINGHAM

### REVERSING AND REMANDING

This is a mineral trespass case involving the interpretation and application of a mining insurance policy. The central issue is whether an insured mining company's unauthorized removal of minerals from the property of another is an "occurrence" that unintentionally caused "property damage" as defined by the insured's Commercial General Liability ("CGL") policy.

The measure of damages is also at issue. If the mining company's removal of the coal was an innocent trespass, then the proper measure of damages is "the value of the mineral after extraction, less the reasonable expenses incurred by the trespasser in extracting the mineral." *Harrod Concrete & Stone Co. v. Crutcher*, 458 S.W.3d 290, 296 (Ky. 2015). However, if the removal was a willful trespass, then the measure of damages is the

reasonable market value of the coal, without compensating the trespasser for removal expenses. *Id.* While a tortfeasor is liable for willful or innocent trespass, a tortfeasor's trespass and conversion, both intentional torts, are not "accidents," and are therefore not "occurrences" covered by the CGL policy.

The trial court ruled in favor of the injured property owner, and the Court of Appeals unanimously affirmed. We granted discretionary review. For the reasons stated herein, we reverse the ruling of the Court of Appeals.

## Factual and Procedural Background

Beginning in 2007, Ikerd Mining, LLC (hereinafter "Ikerd") removed 20,212 tons of coal from land belonging to Peters Farms, LLC (hereinafter "Peters"). Of that amount, 19,012 tons were wrongfully mined under Ikerd's alleged mistaken belief as to the correct location of Peters' boundary lines. The other 1,200 tons were mined by Ikerd knowing that the land thereunder belonged to Peters, pursuant to a disputed oral lease agreement between Ikerd and Peters; Peters claimed that the lease was an ongoing negotiation that was never finalized.

In 2010, Peters sued Ikerd and Ikerd's insurer, American Mining Insurance Company, Inc. (hereinafter "AMIC"), for Ikerd's "willful and wanton trespass" onto Peters' property and conversion of coal from it. In response, AMIC argued that the losses claimed by Peters from Ikerd's trespassory mining activities were not an "occurrence," and thus not covered by the insurance policy. During the course of litigation, Ikerd became insolvent, leaving AMIC as the only source for recovery.

2

In 2014, Ikerd, AMIC, and Peters reached a partial settlement. By their agreement, AMIC advanced $15,000 to Peters to preserve the mining permit on the property. Ikerd also admitted that it had mined the coal without Peters' consent, but the settlement left open whether Ikerd's mining was "intentional." Peters gave Ikerd a full release in the settlement, reserving its claims against AMIC for any available insurance coverage under Ikerd's policy.

The parties agreed to submit two issues to the trial court: (1) whether the insurance policy covers the damage caused by Ikerd's actions; and (2) whether the proper measure of damages is the reasonable royalty rate, which the parties agreed was $75,000, or the market rate of the coal less extraction costs, valued at $400,000.

The Owsley Circuit Court conducted a bench trial and concluded that injuries to Peters' property were the result of two separate and distinct mistakes committed by Ikerd. First, an Ikerd employee, Conway Speaks, offered testimony that the removal of 19,012 tons from Peters' property "occurred because of an 'accident' and a 'mistake' as to the location of the boundary line." He claimed that Ikerd only intended to mine coal from adjacent land belonging to Charles Gross, but mistakenly mined Peters' land instead. Second, according to Speaks' testimony, 1,200 tons of coal were knowingly removed from Peters' property, because "Ikerd's employees mistakenly believed [Ikerd] had permission from Peters to mine it. In fact, Peters had never entered into a lease with Ikerd."

3

The court determined that both of Ikerd's mistakes in mining Peters' property were "accidents," which meant each was an "occurrence" under the CGL policy. The court also determined that the removal of coal and foliage from Peters' property constituted "property damage" that triggered insurance coverage under the policy.

Further, the court found that additional coverage is provided through an aggregate limit under the "Products-completed operations hazard" ("PCOH") policy located within Section V of the CGL policy. Additionally, the court found that Peters was capable of extracting coal from the property, and, therefore, was entitled to $400,000 for the net market value of the coal based upon *Bowman v. Hibbard*, 257 S.W.2d 550, 552 (Ky. 1952).[1]

On appeal, the Court of Appeals affirmed the trial court's findings. The court, based on the policy's definitions section and this Court's recent decision in *Harrod*, found that Peters had experienced "property damage." The Court of Appeals also determined that an "occurrence" had taken place, because the property damage—the trespassory removal and conversion of Peters' coal—was not intended by the insured. *See Bituminous Casualty Corp. v. Kenway Contracting, Inc.,* 240 S.W.3d 633, 638-39 (Ky. 2007).

Because the Court of Appeals found that "Ikerd mined the Peters' property in good faith, and thus property damage was 'not the plan, design or intent of the insured[,]'" it did not address the "control" aspect of the two-part

---

[1] The "ability to mine" requisite for reaching market rate damages under *Bowman* was subsequently nullified by *Harrod*, 458 S.W.3d at 296.

4

fortuity test for an "accident" outlined in *Bituminous*, 240 S.W.3d at 639, and

*Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 76-77 (Ky. 2010).

Without providing analysis, the Court of Appeals affirmed the trial court's finding that the PCOH policy provides a source for coverage additional to the aggregate limit set on the CGL policy. As for the damages to be awarded, the Court of Appeals agreed with the trial court that the correct measure of damages is the net market value rate of $400,000.

## Analysis

We generally conduct a *de novo* review of the interpretation of insurance contracts. *Cincinnati*, 306 S.W.3d at 73 (internal citation omitted). Likewise, whether the trial court applied the correct legal standard to measure damages is also a question of law, which we review *de novo*. *Nash v. Campbell Cnty. Fiscal Ct.*, 345 S.W.3d 811, 816 (Ky. 2011).

Under the CGL policy at issue, coverage applies to "property damage" caused by an "occurrence." Here, as in *Cincinnati* and *Bituminous*, Section V of the insurance policy defines the term "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions[,]" and, analogous to *Cincinnati* and *Bituminous*, the term "accident" is not defined within the policy agreement.

### *"Occurrence" and "Accident"*

The language of a written insurance policy is given its plain meaning, unless terms are otherwise defined therein; ambiguities are interpreted against the drafter-insurer. *Kentucky Ass'n of Cntys. All Lines Fund Trust v.*

5

*McClendon*, 157 S.W.3d 626, 630 (Ky. 2005). Where the term "accident" is not defined within an insurance policy, it is defined by its ordinary meaning, as "accident" has not acquired a technical meaning within the law. *Cincinnati*, 306 S.W.3d at 74 (internal citation omitted). "Inherent in the plain meaning of 'accident' is the doctrine of fortuity." *Cincinnati*, 306 S.W.3d at 74. The doctrine of fortuity involves analysis of the insured's intent and control. *Id.*

Additionally, this Court recognized in *Bituminous* that an "accident" is "an event that takes place without one's foresight or expectation . . . something that does not result from a plan, design or . . . intent on the part of the insured." *Id.* at 76 (internal citations omitted). However, as this Court now holds in the related case *Martin/Elias Properties, LLC v. Acuity*, 544 S.W.3d 639, 642 (Ky. 2018), *Cincinnati* effectively modified the *Bituminous* test of the insured's "plan, design or intent," and "instead focused on . . . the doctrine of 'fortuity' of the event."[2] Accordingly, under the fortuity doctrine, whether Peters Farms is covered by Ikerd's CGL policy depends upon Ikerd's intent and control regarding its excavation and conversion of Peters' coal.

### i. Intent

This Court has held that "a loss or harm is not fortuitous if the loss or harm is caused intentionally by [the insured]." *Cincinnati*, 306 S.W. 3d at 74. Indeed, this Court recognizes that "the requirement that loss be fortuitous, *i.e.*

---

[2] Given the method by which *Martin/Elias Properties* distinguishes *Bituminous* from *Cincinnati* regarding the intent and control of the insured, this opinion illustrates how the fortuity-related facts in the case at hand differ from those in *Bituminous*, which remains binding precedent in Kentucky insurance law.

not intended, is a concept inherent in all liability policies." *Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 836 (Ky. 2005).

All mining cases that involve the unauthorized removal of minerals are cases of a "trespass/conversion hybrid." *Harrod*, 458 S.W.3d at 294. Trespass and conversion are inherently intentional torts. There always exists the general intent to commit the act, if not the specific result. Consequently, there are two sub-categories in mineral trespass cases for determining the "intent" to *wrongfully* remove the minerals—whether the trespass was "innocent" or "willful." *Id.* This nuance of Kentucky mineral trespass law was aptly summarized by the Sixth Circuit Court of Appeals:

> An innocent trespass is one that is "inadvertent or the result of an honest mistake." *Id.* at 297 (internal quotation marks omitted). Willful conduct, in contrast, involves a trespasser "who knowingly and willfully encroaches or enters upon the land of another and takes his mineral without color or claim of right, or one who dishonestly or in bad faith mines minerals of another and converts them to his own use." *Id.* (citation omitted).

*Journey Acquisition–II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 458 (6th Cir. 2016) (citing *Harrod*, 458 S.W.3d at 297).

As previously noted, the trial court determined that the unlawful removal of 19,012 tons of coal occurred because of Ikerd's good faith, albeit mistaken, belief as to the correct location of the boundary lines between Peters' and Gross' properties. Peters argues that such an "innocent trespass" constitutes an "accident" under the CGL policy. This Court stated in *Harrod Concrete* that mineral trespass is either innocent or willful, and damages available against the trespasser depend upon the trespass' classification.

7

However, although it may not have been Ikerd's intent to mine Peters' coal specifically, Ikerd did intend to mine and sell the coal it extracted. Regardless of whether its trespass was willful or innocent, Ikerd intended to act. This contrasts with *Bituminous*, wherein this Court concluded that "[a]ccident includes intentional acts that cause unexpected or unintended results from the standpoint of the insured." *Bituminous*, 240 S.W.3d at 638. Elaborating upon its conclusion, this Court stated that "while [the insured's employee's] actions were intentional, the damage that resulted to the [plaintiff's] property was neither expected nor intended from the perspective of the [insured]. This falls within the plain meaning of the term accident and therefore meets the definition of occurrence under the CGL policy." *Id.* at 642. The *Bituminous* insured *never* had the intent to demolish its customer's house, whereas Ikerd fully intended for its employees to mine the coal.

Further, while "[t]he insured is entitled to all the coverage he may reasonably expect under the policy[,]" *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 277 (Ky. 1991), this Court has stated as a matter of law that "[c]onversion is an intentional tort" and "[t]here is no such thing as conversion by accident." *McClendon*, 157 S.W.3d at 632. Thus, because the "intent" element of the two-part fortuity test set forth in *Cincinnati* is satisfied here, next we assess Ikerd's control. *Cincinnati*, 306 S.W.3d at 77.

8

### ii. Control

Here, Ikerd had complete control over its employees and any subcontractors who extracted the coal from Peters' property. "For an event to be fortuitous, and therefore an accident, it must be 'beyond the power of any human being to bring . . . to pass, [or is] . . . within the control of third persons . . . .'" *Martin/Elias*, 544 S.W.3d at 644 (quoting *Cincinnati*, 306 S.W.3d at 76). Rather, we find here, as in *Martin/Elias*, that "the [property] damage resulted from the actions purposefully taken by the contractor or those working under the contractor's control." *Id.* Ikerd had a much higher level of control than did the insured in *Bituminous*, where the insured's employee mistakenly demolished a customer's house in a matter of minutes—instead of just the house carport—which is what the insured had actually intended. In comparison, Ikerd directed its employees to excavate coal from Peters' property for several months.

Thus, "[b]ecause the actions taken by [Ikerd], which led to property damage, were entirely under [its] control, and [Ikerd] fully intended to execute the [excavation] plan as [it] did, we cannot say that the resulting damage throughout the property was an accident." *Id.* at 644-45. Accordingly, because we cannot find that Ikerd's disturbance of the foliage upon Peters' land, nor removal and conversion of coal beneath the surface of Peters' land, resulted from an "accident," that property damage is not covered by the CGL policy. Although Peters could have maintained suit against Ikerd in tort, Ikerd's intentional acts are not covered by the CGL policy.

9

### *"Products-completed operations hazard" Coverage*

Finally, we must address the argument concerning the PCOH coverage for "property damage," as set forth in Section V of the policy.

CGL coverage analysis is a three-step process: (1) was the event covered under the policy as an "occurrence?" If so, (2) are there any explicit policy exclusions for the damage that occurred? If not, (3) are there any exclusions to those policy exclusions, such as PCOH coverage?

The language of the PCOH coverage in Section V creates an exception to particular CGL policy exclusions. Determination whether PCOH coverage exists occurs only if this Court finds an exception exists to one or more of the CGL policy exclusions. *See Cincinnati*, 306 S.W.3d at 78 n. 35 (internal citation omitted):

> In simplistic terms, the process is such: if the insuring clause does not extend coverage, one need look no further. If coverage exists, exclusions must then be considered. If an exclusion excludes coverage, an exception to the exclusion may re-grant coverage. However, the entire process must begin with an initial grant of coverage via the insuring clause; otherwise, no further consideration is necessary. *Therefore, in the present case, we do not address any arguments regarding exclusions or exceptions to exclusions because here there is no initial coverage due to the lack of . . . an "occurrence."*

(emphasis added).

Likewise, because we found no CGL policy coverage for Ikerd's innocent trespass and conversion of coal, our analysis ends there.

### **Conclusion**

For the foregoing reasons, we reverse the ruling of the Court of Appeals. We find that the intentional removal and conversion of coal is not an "accident"

constituting an "occurrence," regardless of whether the trespass was willful or innocent. Furthermore, there is no PCOH coverage, because no "occurrence" took place under the CGL policy for which to apply the PCOH exception to any exclusions. This case is remanded to the Owsley Circuit Court for entry of a judgment consistent with this ruling.

Minton, C.J.; Cunningham, Hughes, Keller, Venters, and Wright, JJ., sitting. Minton, C.J.; Cunningham, Hughes, and Venters, JJ., concur. Wright, J., concurs in part and dissents in part by separate opinion in which Keller, J., joins. VanMeter, J., not sitting.

WRIGHT, J., CONCURRING IN PART AND DISSENTING IN PART: The Owsley Circuit Court found two separate and distinct mistakes committed by Ikerd Mining, LLC (hereinafter "Ikerd"). The first was the removal of 19,012 tons of coal from property owned by Peters Farms, LLC (hereinafter "Peters") when Ikerd thought it was mining property owned by Charles Gross. Ikerd's mistake is apparent from the fact it paid royalties for the coal removed from Peters' property to Charles Gross. The second mistake occurred when Ikerd mined 1,200 tons of coal from Peters' property when Ikerd thought it had oral permission, although the lease was never executed.

The majority opinion states that "[t]he court determined that both of Ikerd's mistakes in mining Peters' property were 'accidents,' which meant each was an 'occurrence' under the CGL policy." I agree with the majority that the trial court's ruling was incorrect when it found that the removal of 1,200 tons under the presumption of a lease with Peters was an occurrence or accident.

11

The trial court specifically found that ". . . the nature of the accident, where 1,200 tons were later removed, is different. When this coal was removed from the two orange areas, the employees intended to remove coal from Peters' property under a mistaken belief that it had a lease or a verbal agreement with Fred Peters to allow mining of this area. The court does find this to qualify as an occurrence or accident within the meaning of the policy."

In this instance, Ikerd knew it was mining on Peters' property, intentionally mined the coal, and knew that it did not have a written agreement giving it the right to mine the coal. Ikerd claims that it thought it had verbal authorization to mine the coal. This cannot be considered an accident because the statute of frauds requires that a lease to mine coal must be in writing. KRS 371.010. Ikerd's actions were intentional mining of the 1,200 tons of coal when they knew that the property and coal were owned by Peters Farms, Inc.

Ikerd knew that it did not have any written lease or authorization to mine, although they claim to have believed that they had an oral lease or permission to mine, under the statute of frauds they were without any legal right to mine. The circumstances and insurance contract must be interpreted consistent with the laws and administrative regulations of the Commonwealth of Kentucky. Therefore, this is not an accident and cannot be an occurrence under the terms and conditions of the insurance contract.

All parties must comply with the laws and administrative regulations of the Commonwealth of Kentucky. KRS 350.020 states that "[t]herefore, it is the purpose of this chapter to provide such regulation and control of surface coal

12

mining operations is to minimize or prevent injurious effects on the people and resources of the Commonwealth. To that end, the cabinet is directed to rigidly enforce this chapter and to adopt whatever administrative regulations are found necessary to accomplish the purpose of this chapter."

KRS 350.060 (10) requires that a permit applicant shall file proof that it has "public liability insurance coverage satisfactory to the Cabinet . . . ." Pursuant to this statute, the cabinet has promulgated administrative regulations. 405 KAR 10:030 (2)(b) states that "[t]he policy shall provide for personal injury and property damage protection in an amount adequate to compensate for *all* personal injury and property damage resulting from surface coal mining and reclamation operations, . . ." (Emphasis added.) The regulation requires the insurance policy to compensate for all damage without any limitation as to whether the damage was accidental or not.

The commercial general liability coverage form (hereinafter "CGL") used in this case is a multipurpose form intended to cover a wide range of businesses under a wide range of circumstances. This results in ambiguities that must be resolved in favor of the insured and consistent with Kentucky statutes and regulations. The statutes and regulations would require that the policy be interpreted as providing coverage for the damages inflicted on the property owned by Peters Farm when Ikerd mined 19,012 tons of coal that it mistakenly thought was owned by Charles Gross.

The mining of the 19,012 tons of coal before the establishment of Peters' property line has different circumstance that constitutes an accident and an

13

occurrence under the insurance contract. Ikerd intended to mine coal owned by Charles Gross, mined the coal, and paid the royalty to Charles Gross. The accident occurred when the property was mistakenly identified as belonging to Charles Gross when it belonged to Peters Farm. The majority's opinion turns on Ikerd's intent to mine the coal. Ikerd intended to mine coal, but the intent was to mine the coal owned by Charles Gross. Ikerd accidentally mined the property owned by an innocent third party, Peters Farm, Inc.

The court must determine whether the mining of the coal was an occurrence under the terms and conditions of the insurance contract. The contract was drafted by American Mining Insurance Company and any ambiguity in the contract must be construed against the drafter. *Simon v. Cont'l Ins. Co.*, 724 S.W.2d 210, 213 (Ky.1986) ("when ambiguities exist, we resolve them against the drafter in order to circumvent the technical, legalistic and complex contractual terms which limit benefits to the insured) (internal quotation marks omitted). This case must also be interpreted under the requirement that the "occurrence" must be broadly and liberally construed. "Courts and commentators alike are in agreement that the term 'occurrence' is to be broadly and liberally construed in favor of extending coverage to the insured." *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 278 (Ky. 1991). "A policy or contract of insurance ordinarily is to be construed liberally in favor of the insured and strictly as against the insurer." *Koch v. Ocean Acc. & Guar. Corp.*, 313 Ky. 220, 224, 230 S.W.2d 893, 895 (1950).

14

The case this Court has decided that is closest to the present facts is *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633 (Ky. 2007). In *Bituminous,* a contractor was hired to remove the driveway, carport and the concrete pad on which it sat. The contractor hired a subcontractor to assist with the job. The subcontractor misunderstood his task, began work on the house owned by the individuals who hired the contractor before the contractor arrived and demolished a large part of the residence. This court ruled that the subcontractor's demolition of the house was an "accident" that constituted an "occurrence" due to a mistake that resulted in his misunderstanding what part of the property he was to demolish. *Id.* at 636, 639-40.

In the current case, all the conditions are present that occurred in *Bituminous* plus the additional condition that the property that was ripped apart and the coal gouged from the earth belonged to an innocent third party. Here, the property boundaries were unclear, unmarked, heavily disputed throughout the life of this case, and no notice was given to Ikerd that it was coming up to and then crossing Peters' property line. The trial court found that Conway Speaks "clearly testified that they never had a 'plan, intent or design' to take this coal belonging to Peters but, rather, only intended to mine coal from land belonging to Charles Gross. This coal (19,012 tons) was removed from the horseshoe area on Exhibit 5 of Peters' property by accident, as established by the uncontested proof of witness Conway Speaks. No witness was called who rebutted or contradicted this testimony."

15

In *Bituminous,* the subcontractor accidentally tore down part of the residence that the people who hired the contractor did not intend to have torn down. In other words, he worked on the wrong part of the property owned by the people who hired them to do work. In the current case, the mining company accidentally mined coal on property owned by someone other than the person who leased coal to Ikerd. The trial court found the uncontested evidence to prove that Ikerd intended to mine property owned by Charles Gross and mined the property owned by Peters Farm by mistake—which was an accident.

The next issue we must consider is the concept of fortuity as it has been defined in our case law. The first part of the concept is the issue of intent. As former Supreme Court Justice William E. McAnulty, Jr., wrote while sitting on the Court of Appeals, under insurance law an accident is "something that does not result from a plan, design, or an intent on the part of the insured." *Stone v. Kentucky Farm Bureau Mut. Ins. Co.,* 34 S.W.3d 809, 812 (Ky. App. 2000). Moreover, this Court has held "[i]t is abundantly clear, therefore, that the issue of control is encompassed in the fortuity doctrine. . . . Simply put, faulty workmanship is not an accident." *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.,* 306 S.W.3d 69, 76 (Ky. 2010) (internal quotation marks and citation omitted). We went on to hold "[b]ut the contractor's action in *Bituminous Cas. Corp.* is readily factually distinguishable from the case at hand because that case was not a faulty construction case." *Id.* at 77.

16

The case before us is not a faulty construction case. As in *Bituminous*, the current case is one in which the company mistakenly tore apart the wrong piece of property. There is no allegation that Ikerd performed a continuing series of bad or inferior work. Ikerd made a mistake in identifying the property line. This is a mistake that was made once and then Ikerd proceeded with mining the property. It is not the type of mistake that would be revisited each time another layer of earth was removed or a pit of coal severed. The location of property lines can often be a difficult issue to resolve in the mountains of eastern Kentucky. Changes in topography, lost markers or monuments, overlapping or conflicting land patents, and the possibility of the severance of mineral ownership from the surface creates many challenges to the establishment of property lines and mineral ownership. Mistakes can occur.

Once Ikerd made a mistake as to the location of the property lines and began mining, the monuments and markers that could identify the property line were wiped from the face of the earth by the stripping away of the layers of trees, rock, and soil. This makes it much more difficult for Ikerd to identify and correct its initial mistake in locating the property lines once the mining had begun. The accident was Ikerd's mistake in identifying the property lines and that occurred in a very short space of time. The mining did take place over a much longer period of time, but the mistake and accident occurred in a short space of time and was impossible to correct once the monuments and markers were stripped away.

In *Bituminous*, the owner of the property was the one who hired the contractor to tear down the carport and had much greater control of what was done than did Peters Farm. In the current case, Peters did not know that its trees were being torn down, the very earth itself being ripped apart, and 19,012 tons of coal being gouged from the earth it owned. Peters lacked any ability to notify Ikerd, explain the property lines, warn it not to cross onto Peters' property, or correct the mistake that Ikerd had made.

In *Cincinnati Ins.*, we cite to *Essex Ins. Co. v. Holder*, where the Supreme Court of Arkansas held "[f]aulty workmanship is not an accident; instead, it is a foreseeable occurrence, and performance bonds exist in the marketplace to insure the contractor against claims for the cost of repair or replacement of faulty work." 370 Ark. 465, 540 (2007). The contrast between commercial general liability insurance and performance bonds provides options for someone hiring a contractor to do work. In the present case, Peters was an innocent third party which lacked any contact, ties, oversight, or ability to purchase insurance or performance bond for the work done by Ikerd.

Ikerd made a mistake in identifying the property lines that resulted in terrible damages to the property owned by Peters. If this court takes the position that any mistake by the insured was within their control and not covered by the insurance policy, then this insurance will be meaningless. It is a slippery slope when you can take any mistake, claim it was within the control of the insured, and eliminate the coverage.

For the foregoing reasons, I cannot agree with the majority's conclusion that Ikerd's removal of coal from Peters' property was not an accident—and therefore, not covered under the policy. I would hold instead that the removal of coal from the wrong property was accidental and amounted to an "occurrence" under the policy. Therefore, I dissent as to this portion of the majority opinion.

Keller, J. joins.

COUNSEL FOR APPELLANT:

Virginia Hamilton Snell
Amanda Warford Edge
WYATT, TARRANT & COMBS, LLP

COUNSEL FOR APPELLEE:

Mendel Austin Mehr
Philip Gray Fairbanks
Bartley Kemble Hagerman
MEHR FAIRBANKS & PETERSON TRIAL LAWYERS, PLLC