NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0406n.06

No. 24-5842

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 20, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| CYPRESS CREEK EQUINE, LLC, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| NORTH AMERICAN SPECIALTY | ) | DISTRICT OF KENTUCKY |
| INSURANCE CO., | ) | |
| | ) | |
| Defendant-Appellee. | ) | O P I N I O N |
| | ) | |

Before: THAPAR, NALBANDIAN, and READLER, Circuit Judges

**NALBANDIAN, Circuit Judge.** Cypress Creek Equine breeds racehorses. Essential to its business model was Laoban, a stallion who represented the company's most valuable breeding stock. Cypress Creek held a fifty-percent ownership stake in Laoban and so made thousands in stud fees from breeders who wanted to sire foals with his pedigree. But Laoban developed performance issues. So a veterinarian administered a cocktail containing four chemical compounds—colloquially known as "the black shot"—to put some pep in his step. It didn't work. Minutes after receiving the injection, Laoban was dead. The likely cause of death was an anaphylactic reaction. But like most valuable studs, Laoban had a mortality insurance policy. And so Cypress Creek sought a declaratory judgment stating that it had a right to full mortality coverage. But the district court held that coverage was rightfully denied under the policy.

Because the circumstances of Laoban's death fall within the plain language of the policy's Unauthorized Medication Exclusion, we affirm.

## I.

Laoban was a Thoroughbred racehorse sired by Uncle Mo in 2013. He had a reasonably successful racing career, winning one of his nine career starts with a cumulative total of $526,250 in earnings. So in 2017, Laoban was put out to stud in New York. And his first-crop foals did quite well, making Laoban the second-ranked, first-crop sire for 2020. This prompted his owners to relocate Laoban to the more competitive Kentucky breeding circuit and increase his stud fee to $25,000 from the $7,500 it had charged in New York.

This move coincided with a change in Laoban's ownership. Ownership was divided into fifty fractional interests with each fractional owner being a member of the Laoban syndicate.[1] And each of these fractional interests entitled the owner to a distribution of the proceeds generated by Laoban's stud fees. Cypress Creek Equine acquired twenty-five of these fractional interests from Southern Equine Stables, LLC. And WinStar Farm of Versailles, Kentucky, bought another eighteen fractional interests. The remaining ownership interests were spread among several smaller investors. Following the move to Kentucky, WinStar became the syndicate manager, meaning that it ran most of the day-to-day operations while Laoban stood at stud in Versailles.

And this change in ownership affected Laoban's insurance coverage. In 2021, NAS issued two insurance policies that provided Laoban with a cumulative five-million dollars in mortality coverage. The policies required NAS to pay this amount upon the "death of a horse for any reason." R.13-1, Policy No. 100337500, p.18, PageID 256; R.13-2, Policy No. 100337600, p.12,

---

[1] Because owning a racehorse is a capital-intensive venture, it's common for multiple investors to come together and form a syndicate to buy shares in the horse.

2

PageID 276. But the policy was limited by the Unauthorized Medication Exclusion, which prevented coverage for "loss caused by or resulting from . . . administration of drugs or medication to the horse, unless done by or under the direction of a veterinarian and certified by him/her to have been of a preventative nature or necessitated by accident, sickness or disease of the horse." R.13-1, Policy No. 100337500, p.19, PageID 257; R.13-2, Policy No. 100337600, p.13, PageID 277.

After the move, everything seemed to be looking up. Laoban was scheduled to breed his first book of Kentucky mares and was regarded as a top second-crop sire going into the 2021 breeding season. But even before the move to Kentucky, Laoban had been having breeding issues. WinStar ordered a pre-purchase physical examination by a reproductive specialist, who recommended certain breeding conditions and medications before noting that further "pharmaceutical aids" might be necessary "[i]f ejaculatory issues arise." R.36-4, Pre-Purchase Report, p.2, PageID 642. Once at WinStar, Laoban intermittently had trouble breeding, often refusing to mount the mares. Because each refusal put the associated $25,000 stud fee in jeopardy, WinStar began searching for solutions. The company consulted several fertility and reproductive specialists who prescribed treatments such as shockwave therapy and regular testosterone injections. And in February and March 2021, Laoban was diagnosed with degenerative arthritis of the C5-6 and C6-7 caudal cervical facets in his neck.

Despite these issues, WinStar proceeded to breed Laoban to 126 mares during the first three months of the 2021 season. This was a dramatic increase from the 67 mares that he was bred to during the 2020 season. At $25,000 a pop, the economic incentives are obvious.[2]

---

[2] The economics of Thoroughbred breeding are driven by genetic pedigree. These genetic records are kept by a private entity called the Jockey Club, which runs the breed registry for all American Thoroughbreds. To be in this registry, known as the American Stud Book, a Thoroughbred foal

But matters came to a head when Laoban refused to breed his mares during consecutive sessions on May 22 and 23. Unable to find any physical ailment that would cause Laoban's reluctance, WinStar's associate veterinarian, Dr. Heather Wharton, conducted shockwave therapy on the horse's neck. But still Laoban refused to breed. And so Wharton consulted David Hanley, WinStar's general manager, and Larry McGinnis, the farm's stallion manager. At that meeting, Hanley suggested that Wharton give Laoban a "vitamin shot" that contained Vitamin B12, though he didn't specify what else that shot should contain. R.33-6, Wharton Examination Under Oath, pp.66–69, PageID 531.[3]

With this instruction, Wharton administered an intravenous injection containing not just Vitamin B12 but also Vitamin C, Vitamin B Complex, and Iron Hydrogenated Dextran. Wharton developed the injection by drawing on her experience working with racehorses in California where she had often administered the shot to aid post-race recovery. She referred to this particular cocktail as "the black shot" because the Iron Hydrogenated Dextran gave the solution a dark black color. *Id.* at p.79, PageID 534. Though Wharton later testified that she learned this technique from the supervising veterinarian she worked for in California, she admitted that she didn't know of any other veterinarians who administered this exact vitamin combination intravenously.

---

must be conceived through live cover breeding (*i.e.*, not through artificial insemination or cloning.) This means that there is a huge economic incentive to breed stallions as often as possible during a season. Though the Jockey Club has attempted to limit the number of mares a stallion can breed in a single season to 140, there is no restriction—besides the stamina of the horse.

[3] An examination under oath is an investigatory device used by insurance companies when investigating a claim. Similar to a deposition in federal practice, the insurer can compel the insured or a relevant witness to submit to questioning under oath. But unlike in a deposition, the insured has no right to cross-examine the witness. *See* Jordan R. Plitt et al., *Couch on Insurance* § 196:3 (3d ed. 2025). Consenting to examination under oath is often a condition precedent to coverage. *See State Farm Mut. Auto. Ins. Co. v. Adams*, 526 S.W.3d 63, 67–68 (Ky. 2017).

As a result, Wharton began preparing the shot. But in collecting these ingredients from WinStar's onsite pharmacy, Wharton neglected to read the labels. If she had, she would have seen that the Vitamin B Complex expired in April 2019, the Iron Hydrogenated Dextran expired in July 2012, and the Vitamin B12 expired in February 2020. More importantly she would have seen that warnings on at least some of the shot's components stated that they contained compounds that have "resulted in anaphylactic shock." R.36-13, Label Photos, p.1, PageID 686.. Laoban had never been given any of the shot's components, so Wharton knew nothing about his sensitivity to the ingredients.

On the morning of May 24, 2021, Wharton combined 10cc's each of Vitamin C, Vitamin B12, and Vitamin B Complex with 2 cc's of Iron Hydrogenated Dextran into a syringe. She then administered the black shot to Laoban's jugular vein—even though the warning label on the Iron Hydrogenated Dextran solution emphasized that it was "[f]or intramuscular injection only." R.36-13, Label Photos, p.6, PageID 691. Wharton left the stallion barn immediately without waiting to see what effect the medication would have. For that reason, no one was there to render aid when Laoban staggered and fell against the stall wall about a minute after the injection. It took several minutes for a groom to look in and realize the situation's severity.

Once Laoban's condition was discovered, McGinnis called Wharton to let her know that they had a horse down in the stall. Wharton rushed back and determined that Laoban seemed to be suffering anaphylaxis—a potentially life-threatening allergic reaction. She tried to stabilize him with several steroid injections but didn't have any epinephrine on hand to alleviate the most dangerous symptoms of anaphylaxis—such as total cardiac system collapse. Laoban didn't respond to the treatments and died soon after. A postmortem analysis confirmed anaphylactic shock as the most likely cause of death.

Seeing the writing on the wall, WinStar chose to settle. The farm offered Laoban's owners $166,500.00 for each fractional share. Assuming Cypress Creek accepted, its twenty-five fractional interests would have resulted in a payment of $4,162,500 to release WinStar from liability for Laoban's death.

But there was still the issue of individual liability. After investigating Laoban's death, the Kentucky Board of Veterinary Examiners filed a complaint against Wharton alleging that her treatment "did not conform to the appropriate standard of care" based on veterinary negligence and violations of the professional code of conduct. R.36-16, Settlement Agreement, pp.1–2, PageID 809–10. To avoid a formal hearing, Wharton entered a settlement agreement that waived her "right to contest the Board's allegation that [her] care for the patient did not conform to the appropriate standard of care." *Id.* at p.2, PageID 810. And the Board disciplined her by (1) suspending her license for ninety days, (2) assessing an administrative fine, and (3) requiring her to undergo a continuing education course on "drug interactions and dosages, pharmacy effects and procedures, and the management of medical emergencies, such as anaphylactic shock." *Id.* at pp.2–3, PageID 810–11.

After Laoban's death, Cypress Creek submitted a claim under Laoban's mortality coverage. In response, NAS sent a letter refusing "to make any commitments as to acceptance of coverage for this loss" before it had completed its own investigation into Laoban's death. R.33-3, NAS Letter, p.1, PageID 508. NAS's investigation centered on reviewing Laoban's veterinary records, conducting examinations under oath for the resident veterinarians at WinStar, and consulting board-certified veterinarians about the appropriate standard of care. After completing the investigation, NAS concluded that Laoban's death wasn't covered, citing the Unauthorized Medication Exclusion among other policy provisions.

Unsatisfied with this result, Cypress Creek sued in state court and sought a declaration that it was entitled to the full amount of Laoban's mortality coverage under the two policies. Because Cypress Creek and NAS were diverse parties, the insurer removed the case to federal court. And NAS responded to Cypress Creek's complaint with an Answer and Counterclaim seeking a declaration that coverage wasn't warranted or that it should be offset by WinStar's settlement payment.

After discovery, the parties each moved for summary judgment. And the district court agreed with NAS, holding that the insurance company rightfully denied coverage under the terms of the insurance policy, including the Unauthorized Medication Exclusion. Cypress Creek appealed.

## II.

This court reviews the district court's grant of summary judgment de novo. *Capen v. Saginaw County*, 103 F.4th 457, 461 (6th Cir. 2024). Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A.

The parties agree that Kentucky law governs this diversity case. Under Kentucky insurance law, a policy's coverage is defined by the contract's terms. *State Farm Mut. Ins. v. Fireman's Fund Am. Ins.*, 550 S.W.2d 554, 557 (Ky. 1977). And that contract's interpretation is a legal question for the court. *Kemper Nat. Ins. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky 2002). The court's interpretation is informed by the "two cardinal principles" that "(1) the contract should be liberally construed and all doubts resolved in favor of the insureds; and (2) exceptions and exclusions should be strictly construed to make insurance effective." *K.M.R. v. Foremost Ins.*,

7

171 S.W.3d 751, 753 (Ky. Ct. App. 2005) (quoting *Ky. Farm Bureau Ins. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992)).

And yet "[a] liberal interpretation is not synonymous with a strained one." *Id.* After all, the goal is to give effect "to the parties' mutual understanding at the time they entered into the contract." *Nationwide Mut. Ins. v. Nolan*, 10 S.W.3d 129, 131 (Ky. 1999). When possible, this mutual understanding should be deduced "from the language of the contract alone" and "clear and unambiguous" words should be given "their plain and ordinary meaning." *Id.* at 131–32 (internal quotation marks omitted). But if that fails, the general rule remains "that uncertainties and ambiguities must be resolved in favor of the insured." *Ky. Ass'n of Cntys. All Lines Fund Tr. v. McClendon*, 157 S.W.3d 626, 630 (Ky. 2005).

Why? Most insurance policies are contracts of adhesion written by the insurance company with little input from the insured. *Jones v. Bituminous Cas. Corp.*, 821 S.W.2d 798, 801 (Ky. 1991). So Kentucky courts interpret ambiguity against the drafter "in order to circumvent the technical, legalistic and complex contractual terms which limit benefits to the insured." *Birdwell v. Shelter Mut. Ins.*, 367 S.W.3d 585, 588 (Ky. 2012) (quoting *Simon v. Cont'l Ins.*, 724 S.W.2d 210, 213 (Ky. 1986)).

Connected to this rule of construing ambiguity is the "corollary" doctrine of reasonable expectations. *Woodson v. Manhattan Life Ins.*, 743 S.W.2d 835, 839 (Ky. 1987). Under this doctrine, "the insured is entitled to all the coverage he may reasonably expect . . . under the policy" such that "[o]nly an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation." *Sparks v. Trustguard Ins.*, 389 S.W.3d 121, 127 (Ky. Ct. App. 2012) (internal quotation marks omitted). And yet this doctrine "does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the

plain meaning in the contract." *Tower Ins. v. Horn*, 472 S.W.3d 172, 174 (Ky. 2015). So an insured's attempts "to muddy the water and create some question of interpretation" isn't sufficient since "[o]nly actual ambiguities, not fanciful ones, will trigger application of the doctrine." *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003) (internal quotation marks omitted).

But what counts as an actual ambiguity? An insurance contract "is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Ky. State Univ. v. Darwin Nat. Assurance Co.*, 677 S.W.3d 294, 300 (Ky. 2023) (quoting *Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010)). But because a court "cannot enlarge coverage or make new contracts under the guise of construction," such inconsistent interpretations must stem from the contract's text. *McClendon*, 157 S.W.3d at 633. And if the insurance policy doesn't give a specific definition for a word, the ordinary meaning governs. *Am. Mining Ins. v. Peters Farms, LLC*, 557 S.W.3d 293, 296 (Ky. 2018). So where a policy term is susceptible to multiple reasonable meanings, the failure to define that term in the contract can give rise to ambiguity. *See Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 641 (Ky. 2007).

**B.**

We review whether the Unauthorized Medication Exclusion applies to the circumstances of Laoban's death. Cypress Creek argues that the contract's plain meaning supports its position that the exclusion doesn't apply.[4] And so it discusses the potential ambiguity in the contract's

---

[4] NAS argues that Cypress Creek waived this argument by failing to "clearly argue in the summary judgment briefing or otherwise that the Policies were ambiguous." Appellee Br. at 28. While it is generally true that "arguments raised for the first time on appeal are forfeited," no such forfeiture occurred here. *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 781 (6th Cir. 2015). Cypress Creek raised the ambiguity issue and offered argument on it in its briefing before the district court. These arguments apprised the district court of Cypress Creek's alternative argument that the challenged policy language was at least ambiguous. And the court addressed these arguments in its opinion granting summary judgment. So Cypress Creek has done all that is necessary to preserve this issue for appellate review.

language only as a fallback. Still it maintains that the terms "drugs or medication" either support its position or are, at minimum, ambiguous. The meaning of this term is crucial to applying this exclusion. And as a result, Cypress Creek alleges error in the district court's refusal to declare this term ambiguous and resolve the ambiguity for the insured.

1.

Begin with the meaning of the term "drugs or medication" in the Unauthorized Medication Exclusion. While this term is not specifically defined in the insurance policy, that doesn't mean it's ambiguous. *Davis v. Progressive Direct Ins.*, 626 S.W.3d 518, 521 (Ky. 2021). When faced with an undefined term in an insurance contract, Kentucky courts give the term "its ordinary and everyday meaning." *Id.* And as in other interpretative contexts, ordinary meaning "is often determined by reference to dictionary definitions." *Erie Ins. Exch. v. Johnson*, 713 S.W.3d 149, 156 (Ky. 2025) (quoting *Jefferson Cnty. Bd. of Educ. v. Fell*, 391 S.W.3d 713, 719 (Ky. 2012)).

Start with the word "drugs." NAS points to Merriam-Webster, which defines "drug" as "a substance used as medication or in the preparation of medication." *Drug*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/drug. That's somewhat unhelpful. But Merriam-Webster's second definition of "drugs" gives the term meaning independent from "medication." Drawing from the Federal Food, Drug, and Cosmetics Act, the dictionary defines a drug as (1) "a substance recognized in an official pharmacopoeia or formulary"; (2) "a substance intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease"; (3) "a substance other than food intended to affect the structure or function of the body"; and (4) "a substance intended for use as a component of a medicine but not a device or a component, part, or accessory of a device." *Id.*; *cf. FDA v. Brown & Williamson Tobacco Corp*, 529 U.S. 120, 126 (2000) (discussing the Federal Food, Drug, and Cosmetics Act's definition of drug). Similarly,

the dictionary defines "medication" as a synonym of "medicine." *Medication*, https://www.merriam-webster.com/dictionary/medication. And it defines "medicine," in turn, as "a substance or preparation used in treating disease." *Medicine*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/medicine.

Rather than contesting these definitions, Cypress Creek asserts a distinction between vitamins and drugs or medication. In effect, Cypress Creek argues that vitamins are dietary supplements that cannot be "drugs or medication manufactured for the prevention or treatment of illness or injury," and that the black shot cocktail consisted only of vitamins and a mineral, not drugs. Appellant Br. at 12. But Cypress Creek cites no authority to support that position. Because Cypress Creek provides no *reasonable* interpretation to oppose the plain meaning of the Unauthorized Medication Exclusion, the provision is unambiguous and should be applied as written. *See Wehr Constr., Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 687 (Ky. 2012). And the only question that remains is whether the circumstances of Laoban's death fall within the plain meaning of that exclusion.

2.

So we address whether the black shot or its constituent ingredients are "drugs or medication" under the exclusion. As discussed, this court should afford the words "drugs or medication" their ordinary meaning because the policy provides no specific definition for the term. *Cincinnati Ins. v. Motorists Mut. Ins.*, 306 S.W.3d 69, 73 (Ky. 2010). The black shot and at least some of its ingredients meet the different definitions of a drug for purposes of the policy. The shot consisted of injectable substances intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease—such as the Iron Hydrogenated Dextran, which is *intended* for treating anemia in baby pigs. Several of the ingredients had a National Drug Code issued by the FDA and

11

is listed in the NIH's National Library of Medicine. And at least some of the ingredients are substances other than food intended to affect the structure or function of the body. Even Wharton herself referred to these ingredients as "pretty harmless drugs" while being interviewed about the incident. R.33-6, Wharton Examination Under Oath, p.92, PageID 537. So at least some of the ingredients separately meet the requirement of being "drugs" under the common meaning of that word.

In a similar vein, the combination of these ingredients into a single treatment—the black shot—falls within the ordinary understanding of "medication" as a substance used for treating disease. Even if the individual vitamins were not drugs,[5] their combination into an intravenous injection administered by a registered veterinarian meets the ordinary definition of medicine. *See* R.36-13, Daily Med. PDF, pp.1–9, PageID 677–685. And Wharton admitted that she administered the black shot with the intent to treat Laoban's low energy levels, which she thought was a symptom of a vitamin deficiency. R.33-6, Wharton Examination Under Oath, pp.68–69, PageID 531.

The black shot's medical purpose and method of administration make it "medication" even if the ingredients didn't qualify as drugs on their own. An example illustrates this point. The ingredients of sterile saline solution are just salt and water, which by themselves aren't drugs. But

---

[5] Notwithstanding the dictionary definitions of "drugs," there are good reasons for not wanting to say that vitamins (as a class) are always drugs. After all, most English speakers wouldn't call a Flintstones multivitamin a "drug"—even though it is a substance other than food intended to alter the structure or function of the body. But this case doesn't require the panel to decide whether vitamins are always "drugs." Instead, this case poses the narrower question of whether the injectable vitamin solutions used here in the black shot are drugs. These vitamin solutions can be purchased only by a licensed veterinarian and were locked in the WinStar pharmacy to prevent unauthorized use. R.33-6, Wharton Examination Under Oath, pp.70–74, PageID 532–33. And so they are a far cry from an over-the-counter multivitamin or dietary supplement.

once combined and administered via an IV-drip to treat dehydration, saline becomes medicine. So too here.

3.

Cypress Creek's contrary arguments are—in a word—unconvincing. In essence, it claims that "vitamin and mineral supplements to increase breeding effort are not drugs and medications." Reply Br. at 9. But it has little in the way of support for this claim.[6] So Cypress Creek resorts to rhetoric, claiming that the black shot was "no different than if Laoban was provided a different type of hay to eat and suffered anaphylaxis." Appellant Br. at 17. But this comparison is facially inapt. Food is excluded from the definition of drugs. And beyond that, there is clearly no comparing a cocktail of expired vitamin solutions administered by intravenous injection with a new type of hay. So Cypress Creek's parade of horribles never gets off the ground because the common meaning of the terms "drugs" and "medication" distinguishes between an intravenous injection conducted by a veterinarian and an extra serving of hay for dinner.

Because the ordinary meaning of "drugs or medicine" applies to the injection Wharton gave Laoban, NAS appropriately denied coverage under the Unauthorized Medication Exclusion. And so the district court didn't err in granting summary judgment.

---

[6] Cypress Creek does cite an FDA landing page on dietary supplements—though it didn't add it to the record. Appellant Br. at 12. Setting aside whether we should consider extra-record evidence, the website doesn't support Cypress Creek's contention. The page notes that "finished dietary supplement products" are subject to "a different set of regulations than those covering 'conventional' . . . drug products." FDA, Dietary Supplements (Oct. 1, 2014), https://www.fda.gov/food/dietary-supplements. But the linked fact sheets make clear that there is a distinction between pure dietary supplements and the "prescription form" of the vitamin often "given as a shot . . . to treat" vitamin deficiencies. *See, e.g.*, NIH, Vitamin B12 Fact Sheet for Consumers (Dec. 15, 2023), https://ods.od.nih.gov/factsheets/VitaminB12-Consumer/. So, at most, this fact sheet supports the view that some vitamins can be medication.

## III.

For this reason, we affirm.