RENDERED: FEBRUARY 21, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1376-MR

BRIANNA ROBINSON                                                         APPELLANT

v.
APPEAL FROM CALLOWAY CIRCUIT COURT
HONORABLE ANDREA L. MOORE, JUDGE
ACTION NO. 13-CI-00519

MONROE GUARANTY INSURANCE                                        APPELLEE
COMPANY

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ECKERLE, L. JONES, AND KAREM, JUDGES.

ECKERLE, JUDGE: This appeal involves a coverage dispute arising from a policy of insurance issued by Appellee, Monroe Guaranty Insurance Company ("Monroe Guaranty"). Specifically, Appellant, Brianna Robinson ("Robinson"), challenges the Calloway Circuit Court's grant of summary judgment and declaration that Monroe Guaranty has neither a duty to defend nor indemnify the underlying Intervening Defendants, John Abbington "Bing" Thomas, individually

("Thomas"), and John Abbington Thomas d/b/a/ Room to Grow Preschool (the "Preschool"), against the claims forming the basis of Robinson's negligence action. This Court, having been fully briefed on the matter, and hearing oral arguments on January 22, 2025, hereby affirms the Calloway Circuit Court's Order.

**FACTUAL AND PROCEDURAL BACKGROUND**

*A.  Robinson's Injuries*

Almost 25 years ago, on May 22, 2000, Robinson was a two-year-old toddler beginning the Preschool in Murray, Kentucky.  Shortly thereafter, on June 1, 2000, Robinson's father, Dr. Thomas Robinson ("Father"), retrieved Robinson after her morning at the Preschool.  Once home, Robinson expressed pain while attempting to urinate.  Father observed redness and irritation in Robinson's vaginal area.  Father immediately called Lisa Robinson, Robinson's mother ("Mother").  Father then took Robinson to the family physician, Dr. Richard Couch ("Dr. Couch"), who theorized that someone intentionally caused her injuries.  Dr. Crouch referred Robinson to Dr. Dawn Deeter ("Dr. Deeter"), a gynecologist, who examined Robinson under anesthesia the following day, on June 2, 2000.  Dr. Deeter determined that Robinson's hymen was stretched, and she had suffered four labial vulvar lacerations requiring stitches.  These findings, according to Dr. Deeter, were "consistent with at least attempted penetration of something blunt." Record ("R.") 699.  Dr. Deeter subsequently consulted Dr. Brent Boles, who did

not personally examine Robinson, but opined that Robinson's injuries indicated attempted vaginal penetration by an adult, not a child.

On or about the same day, June 2, 2000, Father and Dr. Deeter reported Robinson's injuries to the Murray Police Department. A criminal investigation ensued. The record on appeal reflects that Robinson implicated four individuals as potentially causing her injuries, including: (1) Thomas; (2) Jacob, Thomas' 13-year-old son ("Jacob"); (3) a five-year-old child also attending the Preschool ("Madison"); and (4) Father. Both adults, Thomas and Father, submitted to polygraph testing. This testing returned inconclusive results as to Father. Thomas' polygraph assertions showed as truthful.

Acting without direction from law enforcement, Mother gathered and individually stored some of Robinson's underwear. Law enforcement subsequently detected the presence of semen on seven of the eight pairs of Robinson's underwear. R. 677. Thomas and Father provided DNA samples for comparative analysis. One underwear sample was found to be consistent with a mixture of both Robinson's and Father's DNA.

The investigation also consisted of interviews with Thomas, his wife, and Preschool employees, all of whom denied injuring Robinson or having knowledge of the circumstances causing Robinson's injuries. Robinson's parents would later both testify in their depositions that Robinson had stated, on more than

-3-

one occasion, that Madison had touched her private parts. R. 696, 688-92. Robinson's allegation regarding Madison is further documented in medical records, police records, and intake records. R. 656, 658, 688-92, 694, 696. In the alternative, Robinson's parents also testified to her identification of Jacob as the cause of her injuries, which are also recorded in medical and police records. R. 655, 707-708. The identity of the perpetrator was and remains hotly disputed.

Ultimately, a grand jury indicted Father for sexually abusing Robinson. However, three years later, after a jury trial in 2003, a Calloway Circuit Court jury acquitted Father of the criminal charges. To date, no other individual has been criminally charged with causing Robinson's injuries. Because Robinson has advanced the premise that one of the potential perpetrators who hurt her did not commit a sexual crime, we will refer throughout this Opinion to the act as an "injury" or "damage" instead of the sex crime that it readily appears to be.

B. *The Monroe Guaranty Insurance Policy*

As discussed in detail below, Monroe Guaranty sold Thomas, doing business as the Preschool, a policy of insurance that included coverage for Commercial General Liability (the "CGL Form") and Home Child Day Care/Day Care Professional Liability (the "DCPL Endorsement"). The insurance contract has an effective date beginning on July 29, 1999, and expiring on July 29, 2000.

While our analysis below provides a comprehensive and complete examination of the Policy's language, the discussion will center on certain key clauses. First, the CGL Form states that Monroe Guaranty has a duty to defend and indemnify for "sums that the Insured is obligated to pay as damages because of 'bodily injury' . . . to which this Insurance applies." R. 126. The "insurance applies to 'bodily injury' . . . only if . . . caused by an 'occurrence.'" R. 126. The CGL Form defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." R. 134.

The DCPL Endorsement modifies the CGL Form's coverage to include "'injury' arising out of the rendering of or failure to render professional services in connection with the operation of the Insured's business as a day care." R. 148. Furthermore, and only with respect to coverage provided by the DCPL Endorsement, the definition of "'occurrence' . . . is amended to include any act or omission arising out of the rendering of or failure to render professional services as a day care." R. 148. The DCPL Endorsement also contains several exclusions, one of which specifically prohibits coverage for injuries arising out of the "violation of any statute, or governmental rule or regulation." R. 148.

C. *Robinson's Complaint, Monroe Guaranty's Intervening Complaint, and the Trial Court's October 6, 2016, Order Granting Monroe Guaranty Declaratory and Summary Judgment*

Thirteen years after the injury, and a decade after Father was acquitted of criminal charges, Mother, as Robinson's parent and guardian for the still-minor child, filed the underlying negligence Complaint on December 12, 2013,[1] naming Thomas, the Preschool, and Room to Grow, L.L.C. as Defendants. Robinson's Complaint includes one count of negligence (which subsumes claims for, *inter alia*, negligent hiring, managing, and supervising its employees), one count of negligent infliction of emotional distress, and one count of negligent failure to rescue. Upon notice of Robinson's pre-suit demand, Monroe Guaranty provided Thomas and the Preschool a defense under a reservation of rights.

On April 15, 2014, Monroe Guaranty filed a four-count Intervening Complaint pursuant to Kentucky Revised Statute ("KRS") 418.040, seeking a declaratory judgment that it has no contractual duty under the terms, conditions, exclusions, and endorsements of the Policy to defend or indemnify the Defendants named in Robinson's Complaint. Regarding Count I of Monroe Guaranty's Intervening Complaint, it disclaims coverage for the Preschool, as the entity is not a named insured under the Policy and its formation date of October 30, 2007, falls

---

[1] In 2015, upon reaching the age of majority, Robinson substituted as Plaintiff in the underlying Complaint and Intervening Defendant in Monroe Guaranty's Intervening Complaint.

well outside the applicable coverage period. Count II of Monroe Guaranty's Intervening Complaint disputes coverage as to Thomas and the Preschool based on the following theories: (1) Robinson's injuries did not arise from a covered occurrence as defined in the Policy; (2) Robinson's injuries did not arise from any negligent act, error, or omission; and/or, Robinson's alleged injuries were intentionally caused, thereby excluding coverage under the Expected or Intended Injury Exclusion of the CGL Form; and (3) "the alleged loss and resultant claimed damages were not reported to Monroe Guaranty 'as soon as practicable.'" R. 36.

Count III of Monroe Guaranty's Intervening Complaint alleges that any coverage extended to Thomas and the Preschool under the DCPL Endorsement is subject to all three exclusions listed therein, including that the alleged loss arises from: (1) the violation of a statute, governmental rule or regulation; (2) the liability of an insured, if an individual, for personal acts or omissions of a nature other than day care; and/or (3) dishonest, fraudulent, criminal, or malicious acts or omissions of the insured, any partner, or employee. The final Count IV asserts that coverage may be barred or reduced under other terms, conditions, exclusions, and endorsements not specifically pled.

Following responsive pleadings and discovery, Monroe Guaranty filed a Motion for Declaratory and Summary Judgment. On October 6, 2016, the Trial Court granted the motion, providing the following factual findings:

(1) On June 1, 2000, Brianna Robinson was dropped off at Room to Grow Preschool and subsequently picked up by her father, Thomas Robinson. (2) Late in the afternoon on June 1, 2000, it was discovered that Briana Robinson had been sexually molested. (3) Monroe had previously issued an insurance contract . . . . (4) Within the Monroe Policy is the [DCPL Endorsement] which reads in pertinent part: . . . This insurance does not apply to 'bodily injury,' 'property damage' or other 'injury' arising out of: 1. The violation of any statute, or governmental rule or regulation . . . . (5) The injuries suffered by Briana Robinson were cause by actions that violate multiple sections under Kentucky Revised Statutes Chapter 510.

R. 812. The Trial Court's conclusions of law applied the exclusion found in the DCPL Endorsement for the violation of any statute. Consequently, the Trial Court found, as a matter of law, that Monroe Guaranty was neither under an obligation to provide coverage for Robinson's injuries, nor to defend or indemnify Thomas or the Preschool. The Trial Court's ruling relied on *K.M.R. v. Foremost Insurance Group*, 171 S.W. 3d 751, 752 (Ky. App. 2005), a case in which this Court upheld the lower court's finding of no coverage based on a sexual molestation exclusion contained in a homeowner's policy of insurance. The Trial Court further granted Monroe Guaranty judgment as a matter of law as to the Room to Grow Preschool, L.L.C. based upon the business entity's formation date.

D. *Appellate Review of the Trial Court's Order Granting Monroe Guaranty*
   *Declaratory and Summary Judgment*

Thomas and the Preschool, in addition to Robinson, filed separate appeals challenging the Trial Court's order.  This Court consolidated both appeals and affirmed, holding that "[t]he nature and severity of [Robinson's] injuries leave[] no doubt that the act violated a statute, whether the perpetrator could be identified and convicted or not."  *Robinson v. Monroe Guarantee Ins. Co.*, Nos. 2016-CA-001667-MR & 2016-CA-001668-MR, 2019 WL 3050522, at *5 (Ky. App. Jul. 12, 2019).

On discretionary review, the Kentucky Supreme Court affirmed in part, reversed in part, and remanded for further proceedings.  *Robinson v. Thomas*, Nos. 2019-SC-0451-DG & 2020-SC-0153-DG, 2022 WL 3641184, at *1 (Ky. Aug. 18, 2022).  First, the Supreme Court affirmed the Trial Court's Order as to Room to Grow Preschool, L.L.C., based on the undisputed fact that the entity was not legally formed until 2007, which was clearly outside the applicable coverage period.  *Id.* at *3.  Regarding Thomas and the Preschool, however, the Supreme Court held that the Trial Court and this Court "overlooked a critical step in the calculus of determining coverage . . . ."  *Id.* at *3.  That is, there must first be an initial determination regarding whether Robinson's "claimed injuries resulted from an 'occurrence' which would trigger an initial grant of coverage."  *Id.* at *4. Without a preliminary coverage finding, the Trial Court's declaratory and

-9-

summary judgment based on coverage exclusions was premature. *Id.* at \*4-5 (citing *American Mining Ins. Co. v. Peters Farms, L.L.C.*, 557 S.W.3d 293, 298 (Ky. 2018)).

The Supreme Court then began to analyze the existence of an initial grant of coverage under the CGL Form, including a detailed summary of case law examining commercial general liability policies that define an "occurrence" as an "accident" and as a fortuitous event that occurred by chance. *Id.* at \*5 (citing *Martin/Elias Properties, L.L.C. v. Acuity*, 544 S.W.3d 639, 643 (Ky. 2018)). As applied, the Supreme Court framed the question to include "whether injuries sustained as the result of a sexual assault inflicted upon a child of tender years while that child is under the care and supervision of a licensed daycare qualifies as an 'occurrence' within the meaning of the CGL policy." *Id*. The Supreme Court said that it would halt its analysis there because "[t]he answer to that question necessarily depends on the facts of the case and factual determinations[,]" and "the record is insufficiently developed to permit an appellate court to adequately discern the appropriate answer." *Id*. Nonetheless, the Supreme Court went on to say, albeit in dicta, that it was concerned about lower Courts' application of the subject DCPL Endorsement exclusion, assuming the Trial Court would find that no "occurrence" existed, and it took further aim at the language used. *Id*.

E. *The Trial Court's August 14, 2023, and November 6, 2023, Orders*

-10-

On remand the following year, Monroe Guaranty once again filed a Motion for Declaratory and Summary Judgment. Thomas and the Preschool also filed a joint Motion for Summary Judgment. On August 14, 2023, the Trial Court issued an order titled "Order Granting Monroe Guaranty Insurance Company's Motions for Declaratory Judgment and Summary Judgment and Granting Room to Grow Preschool LLC's Motion for Summary Judgement but Denying John Abbington Thomas; John Abbington Thomas, d/b/a Room to Grow Preschool['s] Motion for Summary Judgment" (hereinafter referred to as the "Final Order").[2]

In its findings, the Trial Court summarized the factual evidence, as we have indicated above,[3] and provided its legal conclusions. After reciting the CGL Form definition of "occurrence" and the doctrine of fortuity, the Trial Court ruled that "the sexual assault of a child of tender years, under the care of an insured, falls squarely within intending an event to occur and that the sexual assault of a child could never be categorized as a 'chance event' beyond the control of the insured." R. 1804. The Trial Court granted Monroe Guaranty declaratory and summary judgment, concluding that it was not required to indemnify or defend Thomas or

---

[2] Robinson subsequently moved the Trial Court to reconsider the Final Order, or, in the alternative, to make the Final Order appealable. On November 6, 2023, the Trial Court granted Robinson's Motion to amend the Final Order to recite finality language, including that the Order is "final and appealable," and there was "no just reason for delay." R. 1828.

[3] We exclude the Trial Court's factual conclusion that semen was found on underwear that Robinson did not wear to the Preschool, as this "fact" is disputed in the record on appeal. R. 675, 678.

the Preschool, as Robinson's injuries did not result by chance or from an "occurrence" under the terms of the CGL Form. Accordingly, it dismissed Robinson's Complaint with prejudice for claims against Monroe Guaranty.

Moving onto Thomas and the Preschool's Motion for Summary Judgment, the Trial Court found that genuine issues of material fact existed concerning whether Thomas and the Preschool were negligent in providing Robinson adequate protection against injury. While Thomas and the Preschool argued that no reasonable jury would believe that Robinson was at risk of injury, the fact remained that the injury occurred. And the Trial Court concluded that negligently allowing the injury to occur was the very essence of Robinson's negligence claim for the jury to decide. It further noted that the discovery of Robinson's injury was close enough in time to her attendance at the Preschool to create a genuine issue of material fact as to "where the injury occurred." R. 1805.

Finally, and in compliance with the dictate of the Supreme Court, the Trial Court's Final Order granted Room to Grow, L.L.C.'s Motion for Summary Judgment. It then dismissed Robinson's Complaint against that entity with prejudice as outside the coverage time period.

It is from this Final Order that Robinson timely appealed to this Court as a matter of right, arguing that the Trial Court erred in granting Monroe Guaranty summary judgment for the following reasons: (1) material issues of fact regarding

-12-

who assaulted Robinson and where the assault took place preclude summary judgment; (2) declaratory relief is improper as Robinson's injuries were caused by a covered occurrence, and there are no applicable exclusions to coverage; and (3) to the extent that Monroe Guaranty argues coverage must denied on the grounds of delayed reporting, the Preschool's delay in reporting the loss to Monroe Guaranty was not prejudicial. Thomas and the Preschool also timely filed a cross-appeal challenging the Trial Court's summary judgement denial. *See John Abbington Thomas, et al. v. Brianna Robinson, et al.*, No. 2023-CA-1409-MR. However, this Court dismissed the cross-appeal, concluding that appellate review of the Final Order is improper since the denial of Thomas' and the Preschool's motion for summary judgement is interlocutory. R. 1867-71.

## STANDARD OF REVIEW

Summary judgment may be granted in a declaratory judgment action pursuant to Kentucky Rules of Civil Procedure ("CR") 56.01; *see also Schmidt v. Halpin*, 351 S.W.2d 57, 58 (Ky. 1961). As CR 56.01 states, "[a] party seeking to . . . obtain a declaratory judgment may, at any time . . . move with or without supporting affidavits for a summary judgment in his favor . . . ." In cases where summary judgment has been granted in a declaratory judgment action, and no bench trial held, the standard of review for summary judgments is utilized.

*Foreman v. Auto Club Property-Casualty Ins. Co.*, 617 S.W.3d 345, 349 (Ky. 2021) (citing *Ladd v. Ladd*, 323 S.W.3d 772, 776 (Ky. App. 2010)).

Judgment is authorized under CR 56.03 "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Carter v. Smith*, 366 S.W.3d 414, 419 (Ky. 2012) (citations omitted). Further, the record must be viewed in the light most favorable to the nonmoving party, and all doubts must be resolved in the nonmoving party's favor. *Steelvest, Inc. v. Scansteel Service Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). If it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in its favor, then summary judgment is proper. *Id.* (citing *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985)) (stating that summary judgment "is only proper where the movant shows that the adverse party could not prevail under any circumstances."). The word "impossible" in *Steelvest* was "used in a practical sense, not in an absolute sense." *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992).

The party opposing summary judgment must then present "at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Steelvest*, 807 S.W.2d at 482. Moreover, "[b]ecause summary judgment

does not require findings of fact but only an examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to either the trial court's assessment of the record or its legal conclusions." *Bruner v. Cooper*, 677 S.W.3d 252, 269 (Ky. 2023) (footnote omitted).  Our *de novo* standard of review is also consistent with the interpretation of insurance contracts in general.  *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 73 (Ky. 2010).

Additionally, the procedural posture of the case *sub judice* requires our review to abide by the legal principles and holdings set forth in the Supreme Court Opinion, *Robinson v. Thomas*, *supra*, which is now the "law of the case," requiring "obedience" in "all subsequent stages of the litigation."  *Buckley v. Wilson*, 177 S.W.3d 778, 781 (Ky. 2005) (citing *Inman v. Inman,* 648 S.W.2d 847 (Ky. 1982)).

## ANALYSIS

The ultimate issue on appeal is whether Monroe Guaranty has a contractual duty to defend or indemnify Thomas and the Preschool.  The duty to defend is separate and apart from the duty to indemnify.  *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279 (Ky. 1991) (citations omitted).  It is well established that a liability insurer's duty to defend is determined by the allegations of the complaint.  *Id.*  An insured is entitled to a

defense by its insurer against even the most frivolous suits, so long as the complaint describes an event that could fall within coverage. *Id.* Therefore, if the operative complaint alleges facts that create potential coverage under the policy, the insurer must defend the suit. *Id.* On the other hand, "the duty to indemnify is narrower than the duty to defend because it only arises when there is an actual basis for the insured's liability to a third party." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 269 (6th Cir. 2010) (citing *James Graham Brown Found.*, 814 S.W.2d at 279-80). Thus, if the insurer establishes that the policy does not cover the claims, there is no duty to defend or indemnify. *Kentucky Assoc. of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 635 (Ky. 2005). As tailored to the facts before us, this Court must determine, as a matter of law, whether the Trial Court was correct in concluding that Robinson's injuries, as alleged in her Complaint, failed to trigger coverage under the Policy, and thus obviated any duty on the part of Monroe Guaranty to defend or indemnify.

    A. <u>*Basic Principles of Insurance Policy Interpretation*</u>

The interpretation of an insurance policy involves questions of law. *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 638 (Ky. 2007). In making these legal determinations, the "terms of insurance contracts have no technical meaning in law and are to be interpreted according to

-16-

the usage of the average man and as they would be read and understood by him

. . . ." *James Graham Brown Found.*, 814 S.W.2d at 280.  Clear and unambiguous

terms must be construed using their "plain and ordinary meaning." *Nationwide*

*Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129, 131-132 (Ky. 1999).  We must liberally

construe insurance contracts, resolving all doubts in favor of the insureds and

against the insurer, who is almost always the drafter of the contract.  *Kentucky*

*Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992).  Any

exceptions or exclusions must be "strictly construed to make insurance

effective." *Id.*

   B. *The CGL Form and DCPL Endorsement*

         With these principles in mind, and with the understanding this Court

is bound by the coverage analysis espoused in *American Mining Insurance Co.*,

557 S.W.3d at 298, our examination begins with whether Robinson's alleged

injury triggers an initial grant of coverage under the language of the Policy.  The

Policy provides two distinct avenues of coverage.  The CGL Form provides

coverage for occurrences defined as accidents, whereas the DCPL Endorsement

provides coverage for occurrences defined as any act or omission arising out of the

rendering of or failure to render professional services as a day care.  Said

differently, the Policy insures against both accidents and professional errors, both

of which must be evaluated separately.

The CGL Form, titled "COMMERCIAL GENERAL LIABILITY

COVERAGE FORM," provides, in pertinent part, the following:

SECTION I-COVERAGES
COVERAGE A. BODILY INJURY AND PROPERTY
DAMAGE LIABILITY

1. Insuring Agreement.

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this Insurance applies. We will have the right and duty to defend any 'suit' seeking those damages.

*****

b. This insurance applies to 'bodily injury' or 'property damage' only if:

(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the coverage 'territory'; and

(2) The 'bodily injury' or 'property damage' occurs during the policy period.

2. Exclusions.

This Insurance does not apply to:

a. Expected or Intended Injury

-18-

'Bodily Injury' or 'property damage' expected or intended from the standpoint of the Insured.

R. 126.

*****

SECTION V-DEFINITIONS

12. 'Occurrence' meaning an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

R. 134.

The Policy also includes a DCPL Endorsement stating the following:

HOME CHILD DAY CARE/DAY CARE PROFESSIONAL LIABILITY

This endorsement modifies Insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

A. COVERAGE A.-BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I-Coverages) also applied to 'bodily injury', 'property damage' or other 'injury' arising out of the rendering of or failure to render professional services in connection with the operation of the Insured's business as a day care.

****

C. Only with respect to coverage provided by this endorsement, the following exclusions are added to paragraph 2., Exclusions of COVERAGE A.-BODILY INJURY AND

-19-

PROPERTY DAMAGE LIABILITY (Section I-Coverages)

This Insurance does not apply to 'bodily injury' or 'property damage' or other 'injury' arising out of:

    1.  The violation of any statute, or governmental rule or regulation.

    2.  Liability of an insured, if an individual, for personal acts or omissions of a nature other than day care.

    3.  Dishonest, fraudulent, criminal or malicious acts or omissions of the Insured, any partner or employee.

    E.  Only with respect to coverage provided in the endorsement, the definition of 'occurrence' under DEFINITIONS (Section V) is amended to include any act or omission arising out of the rendering of or failure to render professional services as a day care.

R. 148.

C. _Coverage under the CGL Form_

As its name implies, commercial general liability insurance provides businesses with common, broad coverage for losses incurred due to the businesses' liability. *See Couch on Insurance* § 129:1 (3d ed. 2024). However, whether a business' liability is covered under a policy is dependent on the language of the insuring agreement. Similar to most standardized, commercial general liability policies, the CGL Form before the Court defines a covered "occurrence" expressly

-20-

as meaning an "accident." While it fails to define the circumstances that qualify as an "accident," the term "accident" has no technical meaning in law. Thus, we must employ the term's ordinary lay definition and common usage. *See James Graham Brown Found.*, 814 S.W.2d at 279; *see also Stone v. Kentucky Farm Bur. Mut. Ins. Co.*, 34 S.W.3d 809, 811 (Ky. App. 2000) ("In the context of an insurance policy, the word 'accident' should be interpreted in accordance with its common usage.").

Nonetheless, the Kentucky Supreme Court has provided a legal definition of the term "accident" for use in insurance contexts. It offered that "accident" means "an unfortunate consequence which befalls an actor through his inattention, carelessness or perhaps for no explicable reason at all." *Fryman v. Pilot Life Ins. Co.*, 704 S.W.2d 205, 206 (Ky. 1986). The Supreme Court has also described an "accident" as one that is fortuitous. *Martin/Elias*, 544 S.W.3d at 642; *see also Cincinnati Ins. Co.*, 306 S.W.3d at 74 ("Inherent in the plain meaning of 'accident' is the doctrine of fortuity . . . ."). The controlling proposition is that an "insured cannot have coverage for those things that are 'expected or intended' from the covered conduct." *See Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 836 (Ky. 2005). A reviewing court must determine "1) whether the insured intended the event to occur; and 2) whether the event was a '"chance event"' beyond the control of the insured." *Martin/Elias*, 544 S.W.3d at 643

(quoting *Cincinnati Ins. Co.*, 306 S.W.3d at 76). As fortuity generally means "by chance," it excludes acts that are the product of plan or design.

Kentucky jurisprudence regarding accidents, occurrences, and fortuity generally evolved in the context of property damage due to faulty workmanship or construction defects. These cases evaluated whether the damage resulted from the actions purposefully taken by an insured builder or contractor. *See, e.g.*, *Martin/Elias*, 544 S.W.3d at 642; *Cincinnati Ins. Co.*, 306 S.W.3d at 76; *Bituminous Cas. Corp.*, 240 S.W.3d at 638-39. Based upon our painstaking review, Kentucky law is devoid of any factual scenarios involving the interpretation of a commercial general liability policy for injuries sustained in a potential sexual assault of a child at a day care with general insurance coverage.

Factually analogous cases do exist concerning coverage for injuries to a child at an in-home daycare. Those cases analyzed homeowners' policies of insurance containing exclusions for intended liability, just as the Trial Court did here. *See, e.g.*, *Holzknecht v. Kentucky Farm Bureau Mut. Ins. Co.*, 320 S.W.3d 115 (Ky. App. 2010) (child attacked by dog kept at in-home daycare). However, upon remand, our Supreme Court has foreclosed consideration of such exclusions until the determination of the existence of an "occurrence."

### 1. What Was the "Occurrence"?

To determine whether there was an "occurrence" to invoke insurance, we must first ascertain the event that activates coverage. The incident or conduct at issue is ordinarily obvious, and it is here as well.

This Court has held that the event to be analyzed is that in which the claimant sustained bodily injury. *See Davis v. Kentucky Farm Bureau Mut. Ins. Co.*, 495 S.W.3d 159, 162 (Ky. App. 2016) (citing *Stillwell v. Brock Bros., Inc.*, 736 F. Supp. 201, 205 (S.D. Ind. 1990) ("For purposes of triggering insurance coverage, the prevailing rule is that the time of the occurrence of an accident is when the complaining party was actually damaged or injured and not the time when the wrongful act was committed.")). In fact, this Court highlighted "the fundamental notion 'the tort of negligence is not deemed to have been committed unless and until some damage is done.'" *Id.* (quoting *Muller Fuel Oil Co. v. Insurance Co. of North America*, 95 N.J. Super. 564, 579, 232 A.2d 168, 175 (1967)).

Robinson appears to concede this point in the four pages of her brief that she devotes to the CGL Form. But she later argues that the important event is the negligence and not the injury when addressing the DCPL Endorsement because the injury allegedly arises from the negligence of the Preschool in its operations as a daycare. *See, e.g., Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 508 (6th

Cir. 2003) (citing *Farmers Alliance Mut. Ins. Co. v. Salazar*, 77 F.3d 1291, 1295 (10th Cir. 1996) (the court grappled with identifying the "occurrence" when evaluating coverage for negligent hiring and retention in a wrongful death lawsuit)) ("Before we apply the policy's definition of 'occurrence,' we must first decide what event or events in the causal chain leading to [the injury] should be the focus of our inquiry."). Robinson's cited case law is not binding upon this Court and not relevant to the inquiry whether there was an "occurrence" under the CGL.

Under Kentucky law, the "occurrence" here is Robinson's injury and not any negligence by the Preschool. Even if any negligence of the Preschool precipitated or existed simultaneously with Robinson's injury and damage, the focus of the examination is on the action that produced Robinson's injuries. And no one disputes that a sexual assault caused Robinson's injuries. Robinson has indicated that she does not recall the event, although her Complaint specifically states that her injury was due to a sexual assault. While we do not know, and indeed may never know, the timing, location, and identity of the perpetrator, we nonetheless know what the injury was for purposes of determining whether it was intentional.

### 2. *Was the Event Intentional*?

Despite numerous minds grappling through lengthy discovery, multiple sets of briefing, two rulings from the Trial Court, one other Opinion from

this Court besides this one, and the Kentucky Supreme Court's Opinion, the issue of the intentionality of the sexual assault upon Robinson has never been seriously questioned.

At the outset, the Trial Court ruled that the injuries to Robinson were intentional. It thus held that the exclusion to the Policy for intentional acts applied, and no coverage would ensue. We agreed. The Supreme Court opined that the exclusion was a secondary matter only to be considered if coverage were determined to exist. It specified that it did not offer an opinion on the merits, and it did not hold that the Trial Court's finding of intentionality was erroneous. It did rule that insurance coverage would depend upon the existence of an occurrence. And an occurrence means an accident, by chance event, or fortuity that lacks intentionality, plan, or deliberation.

Upon remand, the Trial Court ruled that the "sexual assault upon a child of tender years, under the care of an insured, falls squarely within intending an event to occur . . . ." R. 1804. This finding of intent was essentially the same as the original one, which was not overturned. But instead of solely applying to a policy exclusion, the Trial Court held that intent formed the basis of making an initial analysis of whether an "occurrence" constituted a covered event. Because intent still existed for the sexual assault, no accident occurred, and Monroe Guaranty was not obligated to insure. Again, we agree. While the case started a

quarter of a century ago, and has a complex procedural history, the issue is straightforward. Indeed, there has never been a dispute that the penetration of two-year old Robinson's vagina by a blunt object causing numerous lacerations and requiring an anesthetic procedure and stitches for the injury and damage was intentional.[4] Furthermore, what acts are intentional, as opposed to accidental, is supposed to be viewed from the standpoint of a layperson. And any reasonable layperson would conclude that penetration of a two-year-old's vagina with a blunt instrument was not an accident, by-chance event, or fortuity.

Likewise, it is not reasonable to believe or rule that a Preschool or its employees would accidentally or mistakenly allow Robinson to be injured in this

---

[4] Although Robinson argues that two of her four proffered potential suspects, Madison and Jacob as juveniles, may have lacked the requisite *mens rea* to be convicted of a sex crime, she makes that argument solely for the proposition that the Policy exclusion for violation of statutes does not apply. She does not claim that Kentucky's juvenile criminal law has any application to the determination of whether an act qualifies as an occurrence for civil insurance coverage disputes. And there is no legal support for her to do so. Indeed, there is no Kentucky law stating that insurance must cover juveniles but not adults who commit the same act or otherwise making insurance coverage depend upon the age of the actor. The Policy at issue here contained no such language, and it would be hard to imagine one that would. Madison and Jacob are not named insureds or Preschool employees. And the fact-finder in a civil insurance case is not determining the identity of the perpetrator of a crime, but rather whether the injury was intentionally inflicted for purposes of coverage regardless of the identity of the perpetrator who inflicted it. Finally, in alleging that juveniles without *mens rea* may have injured her unintentionally, she does not claim that her sexual assault was unintentional. And we certainly would not. Regardless, we need not address further Robinson's claims regarding these juveniles, as the Supreme Court has directed us to refrain from analyzing the exclusions until we determine that an occurrence existed. Because we find no such occurrence, this issue, to which Robinson devoted a substantial portion of her brief, is moot.

manner. Regardless, as stated above, intent applies to the event/injury, not the negligence of failing to prevent it, in assessing what qualifies as an occurrence.

And the Supreme Court has already referred to Robinson's injury as "sexual assault." *Robinson*, 2022 WL 3641184, at \*5. The Trial Court also used that term, as well as "sexual molestation." R. 812. Robinson notes that if her injury constitutes a sex crime, then intent may be inferred under Kentucky law. *See generally Goldsmith v. Physicians Ins. Co. of Ohio*, 890 S.W.2d 644, 645-46 (Ky. App. 1994) (detailing the history and application of the inferred-intent rule in coverage determinations arising from child molestation). Indeed, intent may be actual or inferred from the nature of the act, as well as the accompanying reasonable foreseeability of harm. *Id.*

We abide the Trial Court's application of the inferred-intent rule as supported by our predecessor Court's holding in *Thompson v. West Am. Insurance Co.*, 839 S.W.2d 579, 581 (Ky. App. 1992). In that case, a Panel of this Court found that "sexual molestation is so inherently injurious, or substantially certain to result in some injury, that the intent to injure, or the expectation that injury will result, can be inferred as a matter of law." *See also Goldsmith*, 890 S.W.2d 644 (Ky. App. 1994) (quoting *B.B. v. Continental Ins. Co.*, 8 F.3d 1288, 1293 (8th Cir. 1993)) ("The [inferred-intent] approach . . . stands for the proposition that a person who sexually manipulates a minor cannot expect his insurer to cover his

misconduct and cannot obtain such coverage simply by saying that he did not mean any harm.").

*Thompson*, similar to other inferred-intent cases, arises in the context of personal liability policies preventing coverage for injuries that were intended or expected due to the nature of the actions themselves. *See, e.g.*, *Walker v. Economy Preferred Ins. Co.*, 909 S.W.2d 343, 344 (Ky. App. 1995) (holding "that the 'inherently injurious' act of punching someone in the face supports the trial judge's inference as a matter of law that" the insured intended to injure the victim.); *Kentucky Farm Bur. Mut. Ins. Co. v. Coyle*, 285 S.W.3d 299, 306 (Ky. App. 2008) (finding inferred intent where the insured "admitted that he intentionally and deliberately discharged a bullet" at the victim).

A plain reading of case law shows that Robinson's status as the victim of a sexual crime sufficiently demonstrates an intent to harm and injure her. Because the act here was intentional under the law, it was not an accident. As such, it does not qualify as an "occurrence," and insurance coverage is not implicated.

### 3. *Was the Event Beyond the Insured's Control?*

While we could end our analysis here because there was no qualifying occurrence, and the event did not happen by chance, case law exists holding that we must ask whether the insured had control over the event. *Martin/Elias*, 544

S.W.3d at 642 (holding that the insured contractor planned the basement excavation and thus had full control of the method of stabilizing the foundation for the entire house). The Trial Court again ruled "that the sexual assault of a child could never be categorized as a 'chance event' beyond the control of the insureds."

The Preschool and Thomas claim that they were unaware of the event. However, the record on appeal demonstrates as undisputed fact that the open layout of the facility ensured Robinson was not alone with anyone. R. 676, 687. Thus, without question, the Preschool had control over a two-year-old within its open premises. Of course, the Preschool cannot reasonably argue against control if Thomas or a Preschool employee perpetrated the injury. The same logic applies had the injury been inflicted by Madison, Jacob, Father, or another third-party on their supervised site. Just as the Kentucky Supreme Court noted in *Martin/Elias* regarding the control element, the insured was in charge of planning and executing the operation and had full control over the work. Here, the Preschool and Thomas were responsible for business of the company (school for children), the planning of the job to be done (caring for them), the layout of the area, the supervision of its workers, staffing, the placement of the children, and their safety and well-being. Thus, the Preschool had full control.

To summarize, the intentional, non-accidental nature of the act did not happen by chance. It is thus rendered non-fortuitous. Moreover, the full control of

-29-

the Insured likewise means insurance coverage is not available under the facts of this case.

> *4. Does the Trial Court's Denial of Summary Judgment for the Preschool Have an Effect on the Grant of Summary Judgment for Monroe Guaranty?*

There remains one issue as to coverage under the CGL Form, but it is easily discounted. Robinson claims that because the Trial Court denied the Preschool's and Thomas' motion for summary judgment due to lingering issues of material fact, it should likewise have left the issue of coverage by Monroe Guaranty for a jury to decide. This argument has no bearing on the issue of insurance coverage for intentional acts committed by parties acting outside of the scope of their employment (and uninsured third parties) who operated in an area controlled by the Preschool. The interpretation of insurance policies, like all contracts, is a matter of law.

Moreover, the propriety of the ruling on the Preschool's motion is not before us as it is interlocutory and not appealable. And thus, of course, we are not assuming or ruling that it was correct.

Whether, after all this time, there remain issues of material fact on other matters that appear headed for trial is neither dispositive of, nor relevant to, the issues before us. The identity of the perpetrator of Robinson's injury may never be known. But that identity is not required to make a determination that an

intentional act occurred. Likewise, just because Father was acquitted does not mean that Robinson was not injured (or that Father did not cause Robinson's injury for that matter, although we express no opinion on that issue).[5] Intentional, sexual assault is not covered under this Policy, regardless of who perpetrated it and who was and who was not held responsible for it criminally. Merely because a party does not have insurance coverage does not mean that the party is not liable.

## D. *Coverage under the DCPL Endorsement*

The second source of potential coverage is through the DCPL Endorsement, which provides separate errors and omissions coverage, distinct from the general liability coverage found in the CGL Form insurance agreement. The DCPL Endorsement modifies the CGL Form to include additional coverage for "occurrences" that result in bodily injury or "other 'injury' arising out of the rendering of or failure to render professional services in connection with the operation of the Insured's business as a day care." R. 148. The DCPL defines occurrence to "include any act or omission arising out of the rendering of or failure to render professional services as a day care." R. 148.

As noted *supra*, Robinson cites nonbinding case law to argue that the injury arises from the Preschool's alleged negligence. She also cites extensively a

---

[5] Counsel for Robinson conceded during oral arguments that if Father committed the injury upon Robinson there would be no basis for her Complaint against the named Defendants in the underlying negligence action.

-31-

non-applicable federal case involving waiver of sovereign immunity for issues at a military daycare. However, Robinson's arguments ignore the central and crucial factor of intent. She claims that "but for" the alleged negligence, the injury would not have occurred. However, we do not know as a factual matter, whether the injury even occurred at the Preschool, and we will likely never know.[6] So that statement is not necessarily correct. But rather, the opposite of Robinson's argument rings true: "but for" the injury, she would not be alleging negligence. Regardless, there is simply no Kentucky law stating that we should look to any negligent actions of the insured versus determining whether there is a perpetrator of intentional actions. Likewise, Robinson offers no authority for her argument that multiple causes of injury exist here, and that both negligence and intent are proximate causes. And Kentucky law on the interpretation of insurance contracts does not include a discussion of proximate causation.

The binding, Kentucky legal authority on the issue of the lack of insurance coverage for intentional acts under an errors and omissions policy is clear. It is a fundamental tenant of law that there can be no coverage under a professional errors or mistakes policy of insurance for claims arising from

---

[6] During oral arguments, Robinson's counsel argued that a jury trial is warranted to determine the perpetrator of Robinson's injury and the location in which she sustained injury. For reasons stated forth herein, a jury trial on these issues is not necessary. Moreover, given the number of involved parties, potential perpetrators that Robinson alleged to have caused her injury, and the substantial length of time since the acts, we question whether a trial on these issues is even conceivably practical.

deliberate, wrongful acts. In *Employers Insurance of Wausau v. Martinez*, 54 S.W.3d 142, 144 (Ky. 2001), our Supreme Court stated that it "is inappropriate to find coverage in a policy that is meant to cover professional errors or mistakes, when the claims made arise from deliberate and systematic wrongful acts." It specifically ruled that a criminal conviction is not necessary in order to find the intentional and willful commission of an act. *Id.* at 143.

Furthermore, Robinson's sexual assault did not "arise out of" the Preschool's or Thomas' rendering of or failure to render professional services in connection with the operation of the Insured's business as a day care. This Court has construed the phrase "arising out of" in accordance with its plain meaning. *Hugenberg v. West Amer. Ins. Co./Ohio Cas. Group*, 249 S.W.3d 174, 186 (Ky. App. 2006). The phrase means "'originating from,' or 'having its origin in,' 'growing out of' or 'flowing from' . . . ." *Id.* (citations omitted). This Court reasoned that "arising out of" merely connotes a causal connection with the acts at issue. *Id.*

Here, the genesis of Robinson's damage is the injury she suffered during a sexual assault, *i.e.*, the covered event, as discussed *supra*. Thus, our focus is not on whether any negligence, negligent infliction of emotional distress, and negligent failure to rescue is causally connected to her sexual assault. Rather, the question is whether Robinson's injury originated from, had origins in, grew out of,

or flowed from the Preschool's or Thomas' rendering of or failure to render professional services as a day care.

In reviewing the facts of record, we cannot identify a single genuine issue of material fact precluding Monroe from judgment as a matter of law on this issue. Assuming, *arguendo*, that Robinson was assaulted at the Preschool, we are unaware of any facts of record that the alleged sexual assault was causally connected to the Preschool's professional services or lack thereof. In fact, there is no testimony or facts supported by the record on appeal that anyone at the Preschool witnessed or was aware that Robinson was sexually assaulted, or even that there was a risk that she would be. On the contrary, the undisputed facts show that the Preschool maintained an open layout setup, whereby employees observed the children, and at no time was Robinson left alone with another child, Thomas, or a Preschool employee.

Based upon the facts before us, we find that there can be no realistic argument that the aggravated sexual injuries perpetrated upon Robinson arose out of the rendering or failure to render professional services in connection with the operation of the business of a daycare preschool. Rather, another person's intent to assault a two-year old child sexually is clearly not covered by commercial professional insurance for errors and omissions. And the Endorsement does not operate to turn the undisputed fact of an intentional assault into a negligence claim

to reinstate coverage that never existed because of the non-erroneous nature of the act.

In light of these rulings, we need not proceed with a review of the exclusions of the Policy, because the Policy does not provide coverage in the first place. Similarly, Robinson's allegations about the illusory nature of the contract and the doctrine of reasonable expectations cannot operate to salvage non-existent coverage, and they are therefore moot. Likewise, we need not discuss Monroe Guaranty's allegation of Thomas' prejudicial delay in only reporting the action to Monroe Guaranty more than one decade after it occurred.

The Preschool purchased coverage for accidents in the CGL Form. It also purchased insurance for professional errors and omissions in the operation of a daycare in the DCPL Endorsement. It did not purchase liability insurance for criminal, intentional actions perpetrated upon its premises. And Monroe Guaranty is thus not liable to defend or indemnify those types of claims, such as the case here.

## CONCLUSION

We hold that the Trial Court properly granted Monroe Guaranty Insurance Company's Motions for Declaratory Judgment and Summary Judgment. Robinson has not alleged facts that, if found true by the trier of fact, may constitute an "occurrence" under CGL Form or the DCPL Endorsement. Monroe Guaranty

-35-

has shown that the acts were not accidental or taken by chance as a matter of law. Rather, the actions against Robinson were intentional for the purposes of insurance contract interpretation. In addition, and as already discussed, we need not consider Robinson's arguments concerning the doctrine of reasonable expectations or illusory coverage, nor must we evaluate Monroe Guaranty's arguments concerning Thomas' delayed reporting, as those arguments are now irrelevant or moot. Accordingly, the Trial Court's grant of summary judgment in favor of Monroe Guaranty on the issue of coverage is affirmed.

ALL CONCUR.

BRIEF FOR APPELLANT:

Kevin C. Burke
Jamie K. Neal
Louisville, Kentucky

ORAL ARGUMENT FOR APPELLANT:

Jamie K. Neal

BRIEF FOR APPELLEE:

David K. Barnes
Matthew R. Londergan
Louisville, Kentucky

ORAL ARGUMENT FOR APPELLEE:

Matthew R. Lonergan